UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CARGILL, INC.

CIVIL ACTION

VERSUS

NO. 10-487-JJB

BRETT MICHAEL CLARK, ET AL.

## RULING ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, MOTION TO STRIKE

This matter is before the Court on Plaintiff Cargill, Inc.'s ("Cargill") motion for summary judgment (Doc. 32) and a motion to dismiss and in the alternative, a motion to strike (Doc. 37) filed by defendants Brett Michael Clark ("Clark"), Clark Farm #2, L.L.C. ("Clark Farms") and Bayou Current Farms, L.L.C. ("BC Farms") (collectively "defendants"). Oral argument is unnecessary. Jurisdiction exists pursuant to 28 U.S.C. § 1332. For the reasons herein, the Court GRANTS Plaintiff's Motion for Summary Judgment (Doc. 32) and DENIES Defendants' Motion to Dismiss and in the alternative, Motion to Strike. (Doc. 37).

I.

Between March 2006 and September 2007, Cargill and Clark Farms #2 entered into eleven separate contracts for the purchase of grain. (Purchase Contracts, Doc. 10-1, Ex. A). Each contract had a provision stating that any disputes resulting from the contract would be settled by binding arbitration in accordance with the Trade Rules of the National Grain and Feed Association.

1

("NGFA"). On July 23, 2008, Cargill filed Civil Action No. 08-460 alleging that Clark Farms failed to fulfill six of the parties' contracts. After discovering the arbitration agreements in the contracts, Cargill moved this Court to remand the suit to arbitration ("Arbitration #1"). (No. 08-460, Doc. 19). Clark and Clark Farms refused to appear, and on August 19, 2009, NGFA entered default judgment in Cargill's favor in the amount of $165,292.96, plus interest. (Doc. 10, pp. 46-49). This Court confirmed that award. (No. 08-460, Doc. 31). However, the Court did not permit Cargill to plead in Clark or BC Farms, but permitted Cargill to file a new suit against those parties.

After Arbitration #1, Cargill brought another arbitration proceeding ("Arbitration #2") against Clark Farm for its alleged failure to pay the five other contracts. Clark and Clark Farm refused to appear, and on October 23, 2009, NGFA entered default judgment on three of the five contracts in Cargill's favor in the amount of $22,400. (Doc. 10-1, pp.50-52). NGFA declined to rule on two of the contracts (Nos. 27199 & 28340) because they were unsigned and no court had determined whether the parties could arbitrate the disputes arising from unsigned contracts. This Court confirmed the award of $22,400 and remanded the case to the arbitrator to determine whether the contracts were arbitrable and if so, whether any monetary award was necessary. (Doc. 23). On April 17, 2012, NGFA awarded a default judgment in favor of Cargill in the amount of $21,325.00, which this Court confirmed. (Doc. 30).

When this Court confirmed the award of $22,400 and remanded the case to the arbitrator, this Court declined to rule on Cargill's veil-piercing argument. (Doc. 23). Cargill had asked this Court (Doc. 13) to pierce the corporate veils of Clark Farm and BC Farms on the theory that they are the alter egos of Clark. The Court found that actions for confirmation of arbitration proceedings are not the appropriate time to pierce the corporate veil, and advised the parties to re-urge this matter once all arbitration matters have been completed. (Doc. 23).

Cargill has submitted a renewed motion for summary judgment asking this Court to find that, in addition to Clark Farm, both Brett Clark and BC Farms are liable for the NGFA arbitration awards totaling $209,987.96 plus interest. (Doc. 33). Cargill is also seeking an award of attorney fees and costs. Cargill urges this Court to consider its arguments submitted in its original Motion for Summary Judgment (Doc. 13), in which Cargill asked this Court to pierce the corporate veil.

In its original Motion, Cargill asserts that on October 22, 2008, three months after Cargill commenced litigation, Clark, the sole member of Clark Farm, ceased doing business. On October 22, 2008, Clark formed BC Farms and was the sole member. BC Farms only assumed the debts and liabilities associated with farm equipment, but did not assume any other of Clark Farm's debts and liabilities, including the Cargill contracts, which are the subject of this litigation. In Clark's deposition, he testified that Clark Farm ceased farming operations so that he could remain in business. (Doc. 13, Ex. E, p. 26). Cargill's counsel asked if Clark ceased operations so that he would "not have to pay upon those contracts,"

to which Clark responded affirmatively. (*Id.*). Cargill argues that Clark continued to farm "just as he had under the Clark Farm name," using the same equipment and the majority of the same tracts of land.

Cargill argues that Clark's personal life and expenses were comingled and intertwined with both Clark Farm and BC Farms and there is no distinction between Clark and the corporate enterprises. Clark testified that farm loans were obtained to finance his operations, and the bank holds the money.  When Clark needed the money, he would send the relevant bill to the bank, and the bank would deposit funds into the farm loan account, from which Clark would write a check. (*Id.* at 48-50). Clark testified that he would pay farm bills personally and then reimburse himself. (*Id.* at 62). Clark was unable to explain checks that were drawn on the farm loan account to his wife, Old Navy, Chase Bank (Clark's wife had a credit card with Chase, but neither Clark nor the farm did), Verizon, and GMAC, which Clark believed was for his wife's vehicle. (*Id.* at 64-67).

Additionally, Cargill points out that the 2008 farm loan check register for Clark Farm and the 2009 farm loan check register for BC Farms list checks written to seed and fertilizer vendors. (Doc. 13, Ex. H and Ex. I). However, the account invoice statements from March 2008, until at least March 2009, show that the Agro account was in Clark's name individually, and not in an enterprise's name. (Doc. 13, Ex. J). The account invoice for the period ending March 25, 2009 shows that a new account was opened in the name of BC Farms. (*Id.*).

Moreover, Clark testified that he carried insurance in his name, although the documents and the testimony do not indicate for what the insurance was carried, whether it was for Clark's car, his wife's car, or for his farm equipment and farm liability, Cargill argues that both personal and business expenses were comingled in insurance policies. (Doc. 13, Ex. E., pp. 81-86). Although Clark could not recall what the insurance policies covered with certainty, the statements from June 2008 to April 2009 list Clark and/or his wife as the insureds. On the April 15, 2009 statement, the insured is listed as Brett Michael Clark, d/b/a Bayou Current Farms, L.L.C. (Doc. 13, Ex. K). Cargill asserts that this is evidence showing that Clark's personal expenses were inextricably intertwined with his business expenses.

In addition to arguing that Clark, Clark Farm, and BC Farms are essentially one, Cargill argues that there is no genuine issue of material fact that Clark, as the sole member of Clark Farm, made a decision to default on the contracts, which are the subject of this dispute. Cargill asserts that the contracts at issue are futures contracts, which means that the seller agrees to sell a crop or a portion of the crop at a later date instead of waiting until harvesting to sell. (Doc. 33). Cargill contends that all of the contracts were futures contracts and all but one contract were booked as "'no basis established' contracts, or 'hedge to arrive contracts,' in which the futures component of the price was fixed, but the basis price was left open." (*Id.* at 4). In this type of a contract, the seller will contract for a future delivery of the product and will lock in a "futures" price, or "the futures

price in effect at the time the contract is entered on the relevant exchange," which leaves the "'basis' component of the price to be set at a later time," a time frame established in the contract. (*Id.* at 5).

Here, Clark contracted with Cargill on behalf of Clark Farms for delivery of wheat, soybeans, and sorghum, or corn in 2007 and 2008. Between the time that Clark contracted with Cargill and the time that Clark Farm was supposed to deliver the crops, the increases in futures prices rose significantly. Cargill points out that had Clark not booked contracts for his crops in advance, he would have been able to take advantage of the higher futures prices at harvest and delivery time. However, because Clark had contracted on behalf of Clark Farm to deliver the crops pursuant to a futures contract, he was obligated to deliver. Cargill contends that Clark defaulted on his contracts so he could sell the crops at market price, which were significantly higher than the contract price.

In Defendants' opposition, Defendants urge this Court to consider the arguments made in their original opposition to Cargill's motion for summary judgment. (Doc. 17). In their original opposition, Defendants argue that fraud should not be found when both parties entered into an arms length contract in good faith. Defendants argue that the "after-the-fact 400% swing in the market value of wheat," the extreme increase of cost of farming supplies factored into this situation, Cargill's refusal to accept delivery of some of the commodities, and Cargill's "unilateral attempted imposition of a negative basis of $1.90 on each bushel [of] wheat to be delivered in 2008" were all factors in this case. (Doc. 17

6

at 20). Defendants argue that Clark did not commingle funds and that he maintained separate bank accounts and points to the fact that he had separate bank accounts for each company and his household. Moreover, he followed the statutory formalities for establishing a limited liability company and in transacting affairs. Defendants assert that whether Clark Farm and BC Farms are the alter egos of Clark and whether Clark disregarded corporate formalities or commingled business and personal funds are disputed factual issues and therefore, summary judgment should be denied.

In the current opposition, Defendants argue that Clark was not a party to the contracts, did not agree to arbitration and did not attend the arbitration proceeding. (Doc. 37). Therefore, the arbitration awards were not rendered against Clark, but Clark Farms. Defendants also assert that Clark Farm did not fail to deliver and/or fill the contracts, but Cargill refused to accept delivery on some of the contracts. (*Id.*) Defendants contend that while Clark Farm ceased farming operations, it was not "solely for the reason stated" by Cargill, which was to avoid liability. (*Id.* at 11). Rather, Defendants argue that there were other obligations that had to be satisfied through ceasing farming operations. However, Defendants point out that Clark Farms has already been deemed liable to Cargill by orders and judgments of this Court.

Defendants argue that Cargill did not accept the grain that was tendered and Clark Farm had no choice but to sell elsewhere. Moreover, Defendants argue that Cargill established an "arbitration requirement and contractual

7

language" on the back the contracts which "may have never been read" by Clark or Clark Farm. Defendants contend there is no indication of any fraud and when "the liabilities became greater than the company could ever satisfy . . . the operation of [Clark Farm] ceased." (*Id.* at 20). Defendants also state that Clark's actions were not improper, dishonest, or illegal, but those of a "high school graduate farmer trying to survive in the complex world of contracting on the futures grain market against a multi-national company." (*Id.*) Defendants assert that Clark's actions were no more improper, dishonest, or illegal than Cargill's "$2.00 negative basis on each bushel that it applied to all of these contracts with no prior notice" and the only difference is the ability of the parties to afford legal fees. (*Id.*)

Although Defendants move to dismiss this case under Rule 12(b)(6), this Court cannot determine the grounds for this motion. Defendants have previously raised this motion, which this Court rejected in its October 17, 2011 ruling. Moreover, Defendants move that Exhibits A-F[1], Cargill's motion for summary judgment, and its supporting memorandum be stricken from the record. Defendants argue that Exhibits A-F are not inadmissible "without qualification as expert opinion or authoritative material." (*Id.* at 1).

---

[1] Exhibits A-F are as follows: a copy of the United States Department of Agriculture, Risk Management Agency publication *Building a Risk Management Plan* (Ex. A) and copies of market data excerpts printed from the Wall Street Journal archives concerning the high and low trading prices of relevant grains during the relevant time period. (Ex. B-F).

In its reply, Cargill argues that Defendants have not adduced any evidence to contradict the facts, which would show that there is a genuine issue of material fact. (Doc. 38). Cargill also points out that Defendants are now trying to argue the merits of the contracts at issue and explain why the contracts were breached, which Cargill contends is not appropriate at this juncture. Rather, Cargill argues that the only issue left for this Court to decide is whether Clark intentionally breached the contract and whether Clark should be held personally responsible via piercing the corporate veil.

Cargill objects both to Defendants' motion to dismiss and motion to strike. Because this Court does not find that the Defendants have raised any arguments to support its motion to dismiss, the Court does not need to address Cargill's objections. With respect to the motion to strike the exhibits attached in support of Cargill's motion, Cargill argues that these were submitted to provide context to Clark's actions. Moreover, Cargill contends that even without this evidence, Cargill's motion can stand, but there is no legal support that this evidence must be qualified as expert opinion or authoritative material. Cargill points out that the Federal Rules of Evidence permit courts to take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).Government publications and

commodity and stock market information are types of facts that qualify for judicial notice.[2]

II.

A motion for summary judgment should be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c). If the issue is one in which the movant bears the burden of proof at trial, the movant must demonstrate the absence of material facts and entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986). If the movant does so, in order to survive the motion for summary judgment, the nonmovant must show that a genuine issue of material fact remains for the fact-finder to resolve.  *Id.* at 323.  A "genuine issue of material fact" exists only when a reasonable fact-finder could return a verdict in the nonmovant's favor.  *Id.* at 248.  In either case, the court must construe all facts in the light most favorable to the nonmovant and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

As a threshold matter, the Court finds that the Defendants have not shown any evidence to support their motion to dismiss, and thus, will deny this motion.

---

[2] *See Canales Martinez v. Dow Chemical Co.*, 219 F.Supp.2d 719, 734, n. 24 (E.D. La. 2002) (finding that the court is authorized to take judicial notice of government publications). *See also Grimes v. Navigant Consulting, Inc.*, 185 F.Supp.2d 906, 913 (N.D. Ill. 2002) (finding that the court is authorized to take judicial notice of published stock quotes).

Moreover, the Court finds that the Defendants have not shown that Exhibits A-F should be stricken from the record, and will take judicial notice of the exhibits. The Defendants' motion to strike is also denied. Thus, the only remaining issue for the Court to decide is whether to pierce the corporate veil and find that Brett Clark and BC Farms are liable for the NGFA arbitration awards.

Louisiana law provides that a corporation is a "distinct legal entity, separate from the individuals who comprise it." *Hormel & Company v. Ford*, 86 So.2d 927, 928 (La. App. 1 Cir. 3/12/86). Typically, shareholders are not liable for a corporation's debt. *Id.* However, a court may "pierce the corporate veil" and hold the individual shareholder liable for debts incurred by the corporation when the shareholder "practices fraud or other misconduct upon a third person through the corporation or disregards the corporate entity to such an extent that the corporation is indistinguishable from its shareholders." *Id.* (citations omitted). The decision to pierce the corporate veil "must be made based upon the totality of the circumstances present in each case." *Id.*

The corporate veil may be pierced when circumstances show that piercing the veil is necessary to "prevent the use of the corporate form in defrauding creditors." *Lopez v. TDI Services, Inc.*, 631 So.2d 679, 685-686 (La. App. 3 Cir. 1994). Additionally, the corporate veil may be pierced when circumstances "clearly indicate that the corporation and shareholder operated as one." *Id.* at 686. When courts consider whether to apply the "alter ego" theory to piercing the corporate veil, courts consider factors including, but not limited to:

11

(1) commingling of corporate and shareholder funds,
(2) failure to follow statutory formalities for incorporating
and transacting corporate affairs, (3)
undercapitalization, (4) failure to provide separate bank
accounts and bookkeeping records, and (5) failure to
hold regular shareholder and director meetings.

*Peyton Place, Condominium Associates, Inc. v. Guastella*, 18 So.3d 132, 149

(La. App. 5 Cir. 2009). Cargill argues that Clark conducted business through

Clark Farm and later through BC Farms "with a virtual disregard for the corporate

form." (Doc. 13 at 15). Cargill points out that personal expenses were paid with

the farm loan funds and farm supply vendor accounts were in Clark's name.

Moreover, although it is unclear what the insurance policies covered, the policies

were in Clark's name but may have covered both personal and business

expenses.

Additionally, Cargill argues that Clark can be held liable under a theory of

intentional and unjustifiable interference with contract. The Louisiana Supreme

Court has found that there are five elements required for an intentional and

unjustified interference with contractual relations action. *9 to 5 Fashions, Inc. v.

Spurney*, 538 So.2d 228, 234 (La. 1989). The elements are

(1) the existence of a contract or a legally protected
interest between the plaintiff and the corporation; (2) the
corporate officer's knowledge of the contract; (3) the
officer's intentional inducement or causation of the
corporation to breach the contract or his intentional
rendition of its performance impossible or more
burdensome; (4) absence of justification on the part of
the officer; (5) causation of damages to the plaintiff by

12

> the breach of contract or difficulty of its performance
> brought about by the officer.

*Id.* Cargill argues that there is no dispute of the existence of the contract or Clark's knowledge of the contract. Moreover, Cargill argues that Clark made the decision not to deliver on the contracts, which caused Clark Farm to breach without justification. Cargill points out that the arbitration awards show that Cargill's damages have been quantified.

Finally, Cargill points out that BC Farms is Clark Farm "reincarnated," and there is no distinction between the entities. When a corporation is merged into another, or where "one corporation has literally absorbed another," creditors may "proceed for the recovery of the amount due them against either corporation, or both." *Roddy v. Norco Local 4-750*, 359 So.2d 957, 960 (La. 1978). According to Cargill, Clark operated BC Farms in the same manner as he operated Clark Farm and the only difference is the name of the entity.

The Court finds that the corporate veil should be pierced. Cargill has produced sufficient evidence to show that Clark commingled personal and business expenses and that Clark operated Clark Farm and BC Farms as his alter egos. The only evidence that Clark has produced is that he maintained separate bank accounts and had separate book-keeping records. (Doc. 17). While Clark may have maintained separate accounts, his testimony indicates that he used his business account to pay for personal expenses, such as a check drawn on his corporate account to pay for his wife's credit card bill and an Old

Navy clothing bill. (Doc. 13, Ex. E). Defendants have not adduced any specific facts to demonstrate that there is a genuine issue for trial. Therefore, the Court will pierce the corporate veil and find that Clark is liable for the actions of Clark Farm and BC Farms.

III.

Accordingly, the Court GRANTS Cargill's Motion for Summary Judgment and will pierce the corporate veil finding Clark liable for the actions of Clark Farm and BC Farms. Cargill is advised to file a separate motion for costs and attorneys' fees.

Signed in Baton Rouge, Louisiana on December 7th, 2012.


_____

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**